ORDERED in the Southern District of Florida on 10/30/07.





Raymond B. Ray, Judge
United States Bankruptcy Court

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov
Broward Division

| | |
|---|---|
| In re: | Case No. 07-18203-BKC-RBR |
| ALTERNATE FAMILY CARE, | Chapter 11 |
| Debtor._____/ | |

### MEMORANDUM OPINION DENYING MOTION TO APPOINT HEALTHCARE OMBUDSMAN

THIS MATTER came before the Court for hearing on October 26, 2007 upon the *Motion to Appoint Patient Care Ombudsman* [D.E. 20] filed by the United States Trustee and the Debtor's response thereto [D.E. 21]. At the hearing Alternate Family Care, the debtor, (hereafter "AFC") was represented by Counsel and Dr. Ronald Simon the secretary and treasurer of AFC. Also present at the hearing was the United States Trustee, through Counsel and the Guardian ad Litem for a minor child who is under the supervision of AFC. At the hearing the Court received into evidence proffered testimony of Dr. Simon. The Court has also throughly reviewed the file and the AFC's website. Based on the following analysis the Court declines to appoint a patient care ombudsman.

The facts of this case can be described as ugly, but relatively simple. AFC is a state licensed child placing and caring agency that provides psychiatric residential treatment services to emotionally disturbed children, affords temporary care for foster children and facilitates

placement of children in foster care relationships throughout the State of Florida. AFC has been in business for over 20 years. Dr. Simon founded AFC on the premise that "specially selected, trained, and supported foster parents could successfully care for seriously emotionally disturbed children in a private residential home setting." *Affidavit of Dr. Simon* [D.E. 36].

At the timing of the filing AFC ran three group homes and two residential facilities. The children in these locations are under constant supervision of AFC. AFC also oversees the placement of children with foster parents. In total there are approximately 109 children under AFC's care or supervision. A slight majority of the children are in foster care placements, with the rest in one of the five facilities.

Pursuant to 11 U.S.C. §333(a)(1)[1], if a debtor is a healthcare business the Court must appoint an ombudsman within 30 days of the commencement of a case unless the Court determines an ombudsman is not required.

The appointment of an ombudsman is determined by the results of a two part test. First the Court must decide if AFC is a healthcare business as defined in §101(27A). Second, if the Court finds AFC to be a healthcare business it must appoint an ombudsman unless it finds "such ombudsman is not necessary for the protection of patients under the specific facts of the case." §333(a)(1).

### Is the Debtor a Healthcare Business?

At the same time that Congress added §333 it also amended §101 by adding §101(27A) which defines the term "health care business". The definition section is divided into two parts. The first part §101(27A)(A) proposes a general definition. The second part, §101(27A)(B) is a

---

[1] 11 U.S.C. §333 was added, effective for all cases filed on or after October 17, 2005, by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Unless otherwise noted, all code references are to Title 11 of the United States Code, also known as the Bankruptcy Code.

rather large list of types of entities that are healthcare businesses. AFC does not fit into any of the businesses listed in §101(27A)(B). Therefore, for AFC to be considered a healthcare business it must meet the §101(27A)(A) definition.

The leading case on §101(27A)(A) is *In re Medical Assc. of Pinellas, LLC*, 360 B.R. 356 (Bankr. M.D. Fla. 2007). In *Pinellas* the court distilled §101(27A)(A) into a four part test: (1) the debtor must be a private or public entity; (2) the debtor must be primarily engaged in offering to the general public facilities and services; (3) the facilities and services must be for the diagnosis or treatment of injury, deformity or disease; and (4) the facilities must be for surgical care, drug treatment, psychiatric care or obstetric care. *In re Medical Assc. of Pinellas, LLC*, 360 B.R. at 359.

The first element is undisputed. AFC is indeed either a private or public entity. This Court agrees with the observation made by Judge Williamson that the first prong of the test "includes almost every conceivable entity." *In re Medical Assc. of Pinellas, LLC*, 360 B.R. at 359.

The second prong requires that AFC be "primarily engaged in offering to the general public facilities and services". *See* §101(27A)(A). In *Pinellas,* the court determined that the debtor was not a health care business. This determination was based primarily on the fact that the debtor was engaged in providing support services to doctors. *Pinellas* 360 B.R. at 357. The court noted that the debtor "did not advertise or procure patients on behalf of the member doctors nor were the doctors doing business under the name of [the debtor] but instead conducted business in their individual names or the names of their individual professional associations." *Pinellas* 360 B.R. at 360. According to the court this limitation on its services meant that the debtor failed the second prong of the test; namely, that the services were not offered to the public. *Id.* The court further noted that services provided were administrative in nature and not for the purposes of diagnosis or surgery. *Id* at 360.

The same result was reached in *In re 7 Hills Radiology LLC*, 350 B.R. 902 (Bankr. D. Nev. 2006)(J. Markell). In that case the debtor was a radiology clinic that only tested patients who were there by referral. *Id* at 904. Further "after the tests are given, [the debtor] does not advise the patients of the test results. Instead it simply sends the reports to the treating physician, who reviews them with the patient." *Id*. The court held that because only referred patients could receive an x-ray, the business was not held out to the public and as such did not meet the definition of a health care business. *Id*.

AFC presents a more complicated situation. First, AFC has on its website a link titled "placement availability". This link includes a number to contact. Second, the very presence of the website suggests that AFC has a public presence and with the link mentioned it is plausible to suggest that it is offering its services to the general public. Third, Dr. Simon stated that it is possible for parents to approach AFC for help in dealing with their child's emotional or psychological problems. Dr. Simon also noted that such cases are exceedingly rare and represent a very small minority of the children that are under the care of AFC. The vast majority of the children under AFC's care are referred to AFC from another agency.

The striking similarity between AFC and the *7 Hills Radiology* case is that referrals were the vital method which the debtor procured business. However, there are two key differences. In *7 Hills Radiology* referrals were the only way for a member of the public to access the debtor's services. Whereas, in AFC's case it is possible, though rare, for a member of the public to access AFC's services. Secondly, in *7 Hills Radiology* the debtor only administered the x-ray, it was otherwise uninvolved in the day to day care of the patients or their treatment. AFC on the other hand has extensive and continuing responsibilities for the well-being of the children in its custody or over which it has supervision. Accordingly, based on its website and the cases where members of the general public have contacted the debtor directly for services the Court finds that AFC is indeed offering services to the general public.

The third prong requires the services or facilities be used for the "treatment of injury, deformity or disease." §101(27A)(A). This prong is clearly met. In the opinion of the Court if a condition is severe enough to warrant a course of medically supervised treatment, whether or not it involves pharmacological treatment, such a condition is sufficient to meet the requirements of §101(27A). The psychological and emotional issues that afflict the children under AFC's care rise to the level of disease.

The final prong requires that the services or facilities be used for surgical care, drug treatment, psychiatric care or obstetric care. This prong is also easily met. AFC's mandate is to provide psychiatric treatment services to emotionally disturbed children. Further, according to Dr. Simon as many as 90% of the children under AFC's supervision receive medications of some sort. This is sufficient to find that the fourth prong is met.

Accordingly, the Court finds that AFC does meet the definition of the a healthcare business. The Court now turns to examine the second step of the test and determine whether under the facts of this case a healthcare ombudsman is necessary.

Is an Ombudsman Necessary Under The Specific Facts of The Case?

Pursuant to §333(a)(1) the Court must appoint an ombudsman "unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case." §333(a)(1). In making this evaluation the Court will examine the totality of the circumstances surrounding the bankruptcy filing and the operations of the debtor. This determination will be made by analyzing the following non-exclusive list of nine salient factors:

(1) the cause of the bankruptcy;

(2) the presence and role of licensing or supervising entities;

(3) debtor's past history of patient care;

(4) the ability of the patients to protect their rights;

(5) the level of dependancy of the patients on the facility;

(6) the likelihood of tension between the interests of the patients and the debtor;

(7) the potential injury to the patients if the debtor drastically reduced its level of patient care;

(8) the presence and sufficiency of internal safeguards to ensure appropriate level of care;

(9) the impact of the cost of an ombudsman on the likelihood of a successful reorganization.

The first factor is the cause of the bankruptcy. In *In re: Saber* the debtor was a medical professional corporation that provided plastic surgery to patients. *In re Saber* 369 B.R 631,633 (Bankr. D. Colo. 2007). The company was owned by the sole physician Dr. Saber. *Id.* His only other employees were a secretary, a medical assistant and a patient coordinator. *Id.* The court determined that the debtor did meet the *Pinellas* test and as such was a health care business. *Id* at 637. However, the court determined that under the facts of the case it was not necessary to appoint an ombudsman. *Id.* at 638. In reaching this conclusion the court noted the bankruptcy was not "precipitated by concerns relating to the quality of patient care or patient privacy matters." *id.* at 637. Rather it was a contractual dispute between the debtor and former employee that caused the bankruptcy filing. *Id.*

This same factor was considered by the court in *In re The Total Womens Healthcare Center P.C.*, 2006 Bankr. LEXIS 3411 (Bankr. M.D. Fla. 2006). In that case the court noted that "[m]ost of [the debtor's] obligations appear to be for taxes. The obligations do not appear to arise from deficient patient care."*In re The Total Womens Healthcare Center P.C.*, 2006 Bankr. LEXIS 3411 at *5 (Bankr. M.D. Fla. 2006).

Similarly, the cause of the bankruptcy in this case was a fire at AFC's primary facility in Hollywood, Florida. AFC generates revenues by a per diem per child payment from either

insurance companies or appropriate government entities. The Hollywood facility was the most profitable facility. AFC did not have adequate insurance to cover the costs of repair and rebuilding the facility. The loss of its most profitable revenue stream coupled with the costs of rebuilding are the direct cause of the bankruptcy. The fire was a result of an electrical failure. Thus the cause of the bankruptcy filing was not related to patient care in anyway. This finding militates against the appointment of an ombudsman.

The second factor looks to see if there are licensing or supervisory entities that are already supervising the level of patient care. In AFC's case they are licensed by several government agencies, including the Florida Department of Child Services. AFC is also subject to supervision by Childnet[2]. Most importantly the vast majority of the children under the supervision of AFC are also under the supervision of a State of Florida Circuit Court by virtue of them being in the foster care system. The child safety net in Florida is already a vast and diffuse bureaucracy. Adding an ombudsman for the pendency of this bankruptcy would be a total duplication of the efforts of the various public and private entities already overseeing the welfare of the children. Accordingly, this factor heavily weighs against the appointment of an ombudsman.

The third factor is the debtor's past history of patient care. The *Saber* court also examined this factor. In that case the court noted "Dr. Saber has practiced more than twenty years and remains in good standing in his profession." *Saber* 369 B.R. at 638. Dr. Simon testified that in the past 20 years there have been many hundreds, if not thousands, of children that have been under the supervision of AFC. In total there have been three complaints against

---

[2] ChildNet is a private, not for profit organization created specifically to manage the child protection system in Broward County as part of a statewide program to transfer the responsibility for child protection, foster care, adoptions and related services to community based organizations.

AFC that related to patient care. The presence of a mere three complaints over the course of 20 years shows that AFC has a remarkable track record of excellence. The Court is convinced that the past history of AFC does not require the appointment of an ombudsman.

The fourth factor is the ability of the patients to protect their rights. If a patient has the faculties to preserve their interests as opposed to a patient that is incapable of articulating and protecting their interests, then the appointment of an ombudsman would be extraneous. In this case the patients are all minor children. By presumption children are generally unable to protect and preserve their interests. In this case it is highly unlikely that children with severe emotional and psychological issues would be able to protect their own interests. The Court is cognizant that many of the children do have guardians ad litem. This factor does seem to weigh somewhat in favor of the appointment of an ombudsman. However, the children's inability to advocate or protect their own interests is not something that is heightened by virtue of the bankruptcy. Accordingly, the Court finds that this factor marginally weighs in favor of the appointment of an ombudsman.

The fifth factor is the level of dependancy of the patients on the facility. There is no doubt that all of the children under AFC's care or supervision are highly dependant on AFC for their safety and well being. Accordingly, this factor militates towards the appointment of an ombudsman.

The sixth factor is the likelihood of tension between the interests of the patients and the debtor. In AFC's case there is little tension. AFC is looking to recover from the disastrous effects of the fire at its Hollywood facility. The reduction of patient care would not help AFC's reorganization. This is because a decline in patient care, whether real or perceived, would severely impact AFC's ability to receive placements from referring agencies. These referrals constitute the bulk of the placements AFC receives and make up a large part of its revenue. Further, the largest cost currently facing AFC is the cost of rebuilding the damaged facility,

making reductions to patient care absent shuttering the business would not materially affect the solvency of the company. The Court is convinced that there is a low likelihood that patient care will be sacrificed or compromised in order to effectuate the reorganization of AFC. Accordingly, this factor weighs against the appointment of an ombudsman.

The seventh factor is the potential injury to the patients if the debtor drastically reduced its level of patient care. In this case if AFC was to drastically reduce its level of care or cease operations the children could suffer severe trauma. Much of this trauma would be a result of having to move to another facility and possibly having to develop new relationships with new care givers. Furthermore, any substantial interruption in patient care would be negative for the children, if one or more of them did not receive their prescribed medications. Accordingly, the potential risk to the patients if AFC reduced its level of care is quite high, the Court finds that this factor weighs in favor of an ombudsman.

The eighth factor is the presence and sufficiency of internal safeguards to ensure appropriate level of care. Dr. Simon testified that there many internal safeguards to ensure that the children are well cared for. Overall, AFC is licensed and supervised by various state and private agencies. Within AFC the care of the children is handled by professionals. With respect to any medication, it is only given according to a prescription. The staff of AFC are responsible to make sure the children take the medication at the appropriate times. However, AFC does not prescribe or medicate the children, all prescriptions are made by a licensed doctor. At any given time the children are only handed a single dose of the medication. Finally, any changes to prescription medication, according to Dr. Simon, are made by the child's doctor and are explained to the State Court in charge of the child's well being. These procedures and safeguards are adequate. Accordingly, this factor weighs against the appointment of an ombudsman.

The ninth factor is the impact of the cost of an ombudsman on the likelihood of a

successful reorganization. At the time of the filing AFC had assets of $996,825.00 and liabilities of $1,837,130.59. This case is, as the Court stated at the hearing, "dead on arrival." The only thing keeping AFC alive and functioning is the financial commitment of Dr. Simon. Dr. Simon lent AFC $75,000 in emergency post petition financing. He has also agreed to extend $500,000 in debtor-in-possession financing. The lack of cash and the inability to obtain financing from conventional sources are clear indicators that this case cannot afford an ombudsman. As such, this factor weighs against the appointment of an ombudsman.

Based on the foregoing it is evident that the patients are highly dependant on AFC and are unable to adequately protect themselves without help and would suffer if AFC reduced its level of patient care. However, there is a tremendous amount of supervision and oversight on AFC from other state and private entities. This supervision is coupled with extensive in house procedural safeguards. Furthermore, the cause of the bankruptcy was not in anyway related to patient care. In fact, the past history of AFC shows that it has been relatively free of patient care complaints. Finally, the lack of tension between the interests of the patients and AFC is readily apparent, both the patients and AFC have a substantial interest in seeing AFC successfully reorganize. To this end the cost of an ombudsman would be a waste of scarce financial resources and would merely add another layer of bureaucracy to an already heavily regulated and supervised company. Accordingly, the Court finds that under specific facts of the case the appointment of an ombudsman is not warranted.

Based on the foregoing it is,

**ORDERED and ADJUDGED** pursuant to 11 U.S.C. §333(a)(1) that a patient care ombudsman is not necessary according to the specific facts of the case.

### 

Copies: all interested parties.